UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| COYVELL JACKSON and | ) | |
| BRENDA JACKSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:18 CV 9 ACL |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a one-day bench trial, upon consent of the parties pursuant to 28 U.S.C. § 636(c). The action was filed pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.* Plaintiff Coyvell Jackson claims that the Defendant, through its agency the Department of Veterans Affairs, was negligent in failing to timely diagnose prostate cancer. Plaintiff Brenda Jackson, Mr. Jackson's wife,[1] brings a derivative claim for loss of consortium. Together, the couple requests a total of $12 million in damages. The Defendant argues that application of the Missouri damage caps for noneconomic damages in medical malpractice actions limits the Jackson's to a combined Judgment of not more than $1,511,480; that being a total of $762,652 for Coyvell Jackson's economic losses and $748,828 for the couple's noneconomic damages. If applicable, in addition to restricting Jackson's noneconomic losses to $748,828, the Missouri damage cap prevents an award of additional damages to Mrs. Jackson for loss of consortium. The $1,511,480 figure is in fact the maximum damage award permitted by the Missouri statutes in effect beginning August 28, 2015.

---

[1] For simplicity sake, Mr. Jackson will be referred to herein as "Jackson" and Brenda Jackson will be referred to as "Mrs. Jackson."

Having considered the pleadings, trial and deposition testimony, and exhibits, the Court finds in favor of the Plaintiffs in the amount of $5,712,402. The following findings of fact and conclusions of law are entered in support of the Judgment, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## I.    Findings of Fact

The parties submitted a detailed Joint Statement of Uncontroverted Facts prior to trial. (Doc. 34.) At trial, Plaintiffs Coyvell Jackson and Brenda Jackson testified. Plaintiffs also presented the deposition testimony of VA treating physician Dr. Richard Tipton; private treating urologist and expert Dr. Arnold Bullock; and economist Rebecca M. Summary, Ph.D. Defendant retained no experts and presented no witnesses at trial.

### A.   Liability and Causation Evidence

#### *Background*

Coyvell Jackson was born in Illinois on May 5, 1963. He lived mostly in California and Missouri as he grew up. Jackson joined the Navy in 1981 and received an honorable discharge in 1985 after having served in Beirut, the Philippines, and Korea. Jackson has an undergraduate degree in Psychology. He lived and worked in California for many years. He has five adult children—three whom he adopted and two biological children.

 In 2008, Jackson's mother developed health problems and he returned to Cape Girardeau, Missouri to help her. Shortly thereafter, Jackson reconnected with his high school sweetheart, Brenda, who had returned to the area to visit family and friends. By 2010, the couple married. Their love, mutual respect, and general affection for one another was apparent in the courtroom.

Jackson worked as the Treatment Family Home Coordinator for the Community Counseling Center.   In that role, he helped transition children from the residential setting to a traditional family setting.   He also educated the families on how to deal with anticipated behavioral issues.   Jackson loved his job and expected he would have worked there into his seventies.   Mrs. Jackson was the head baker at the casino in town.   She was passionate about baking and enjoyed her work.

Together, the Jacksons enjoyed attending church and volunteering for various programs in their church.   For instance, they provided marriage counseling to others.   They were also involved with "Man Camp," a program for young boys with absent fathers that offered the boys an opportunity to interact with positive male figures.   The couple were also physically active together.   They often enjoyed going on walks and travelled.   Another important part of their lives was entertaining and socializing with others.   In addition, the couple enjoyed frequent marital intimacy, including sexual intercourse and affectionate behavior.

When Jackson returned to Missouri in 2008, he began to receive his routine medical care at the VA Medical Center in Poplar Bluff, Missouri, and the VA Community Based Outpatient Clinic in Cape Girardeau (hereinafter "VA").

In 2009, Jackson began having PSA testing done with his regular physical exams at the VA.   PSA blood testing is a blood test used primarily to screen for prostate cancer and it measures the amount of prostate-specific antigen (PSA) in a person's blood.   PSA is a protein produced by both cancerous and noncancerous tissue in the prostate, a small gland that sits below a man's bladder.   The reference range used by the VA for PSA levels in the blood is 0 to 4; a score above 4 is considered high.

*Treatment by the VA*

Jackson's medical records from the VA show that his PSA was screened on seven separate occasions between May of 2009 and December 4, 2015, except that no PSA testing was done between 2011 and 2013.   During a Compensation and Pension Examination (CPE) with a VA claim's adjuster, on February 23, 2016, Jackson was advised that he may have prostate cancer since his most recent PSA level was over 10.   Prior to this news, Jackson was unaware what a PSA level meant.   Jackson was then diagnosed with prostate cancer on April 28, 2016. The following paragraphs summarize the VA's treatment of Jackson prior to his cancer diagnosis.

Jackson's PSA level in May 2009 was 3.87, and in November 2010 was 3.68.   These levels would be considered elevated or high normal, but still within normal limits.   Typically, in a patient his age, Jackson should have been retested on a yearly basis.   This monitoring did not take place in that Jackson's PSA levels were not monitored or tested from 2010 until 2014.

After November 2010, Jackson's PSA was not tested again until July 9, 2014, at which time it had risen to 7.73.   This level is considered high and was flagged by the VA system as abnormal and high.   Jackson's PSA was retested on July 16, 2014, showing a level of 8.75. Again, this was flagged by the VA system as high.   A course of antibiotics was ordered to rule out infection as the cause of the elevated PSA.   Despite two elevated PSA test results, Jackson was not referred to a urology specialist to evaluate whether he had prostate cancer.   Jackson was again tested on August 18, 2014, with a PSA level of 8.02, and a urology consult was requested on that date.

Jackson was seen by VA urologist Dr. Madduri in October of 2014.   Based on the amount of time since his last PSA check, the VA system required another round of antibiotics and a recheck of the PSA level rather than immediate biopsy and ruling in or out of prostate

cancer.   The October 20, 2014 PSA was again high at 8.35.   Even though Jackson's PSA level remained high after antibiotics had been given, a biopsy was not performed and Jackson's referral for additional testing for cancer was not completed by the VA providers.   More than one year passed before Jackson's next PSA test on December 4, 2015, at which time his PSA level had risen to more than 10.

Earlier in 2015, on March 3, Jackson presented to the VA with complaints of right hip pain.   On June 2, 2015, Jackson presented to the VA with complaints of low back pain. Following the reports of right hip and low back pain, an additional PSA check was not ordered and there was no further workup to rule out prostate cancer.

On June 15, 2015, Jackson presented to the VA with complaints of decreased libido.   His treating physician, Dr. Richard Tipton, noted "he does have an elevated PSA, it has been up around 8."   Dr. Tipton also noted Jackson's high PSA "has never been evaluated."   Although this observation was made, no further PSA testing was ordered, and no further workup was done to rule out prostate cancer.

On December 4, 2015, Jackson was seen at the VA by Dr. Tipton for a groin rash.   Dr. Tipton's progress notes include a comment that Jackson "has also had an elevated PSA in the past year and did a month of Cipro but has never been evaluated past this to include a possible biopsy."   There is also an addendum to this note on December 9, 2015, which indicates a need for a referral to a urological specialist.   A referral to Dr. Sam Stokes, a civilian urologist, was approved on January 26, 2016.   Jackson's PSA level was checked again on February 15, 2016, with a result of 10.52.

Jackson saw Dr. Stokes on March 2, 2016, who immediately ordered a biopsy of the prostate.   The results, returned on April 28, 2016, indicated Jackson had prostatic adenocarcinoma with a Gleason's Score of 6 (3+3).   As a result of this cancer diagnosis,

Jackson's care was referred to Dr. Arnold Bullock, a urological surgeon at Washington University in St. Louis, Missouri, for further work-up and treatment. Dr. Bullock ordered the biopsy sample retested by Washington University pathologists in June 2016, and determined that it in fact showed a prostatic adenocarcinoma with a Gleason's Score of 7 (3+4), necessitating surgery. On August 25, 2016, Dr. Bullock performed a radical prostatectomy on Jackson.

Following his prostatectomy, Jackson experienced stress urinary incontinence requiring daily use of four to five pads. Additionally, Jackson had post-operative erectile dysfunction, which did not respond well to Viagra. Jackson continued to be followed by Dr. Bullock and his PSA was elevated on recheck in March of 2017. In light of the findings, a referral to radiation oncology for salvage radiotherapy was made. As a result of the increased PSA and concern of a reoccurrence of cancer, Jackson then had external beam radiation treatment to the prostatic fossa and pelvis. He was additionally treated with androgen deprivation therapy to improve progression-free survival as well as overall survival. He was scheduled for six to seven weeks of radiation treatment and hormone therapy. In approximately October 2018, Jackson began experiencing bleeding from his bladder. This was tested and found to be damage from the radiation therapy he received. Jackson then began hyperbaric treatment for his bladder.

Jackson continues to receive treatment at Washington University with Dr. Bullock and others for his advanced prostate cancer. He is expected to undergo surgery for his incontinence which requires replacing his damaged urinary sphincter with an artificial urinary sphincter. Three penile implant surgeries will also be necessary to enable Jackson to engage in sexual intercourse. He will also require ongoing cancer prevention maintenance, plus ongoing treatment for his radiation damaged bladder and his general associated care and treatment.

*Malpractice*

Dr. Tipton, a VA physician, was deposed on February 20, 2019.   Dr. Tipton testified that in patients with a PSA over 4, there is a higher suspicion of prostate cancer and prostate cancer should be ruled in or out through further testing, including biopsy.   Prostate cancer left untreated can advance or grow.   The standard of care requires a yearly check of the PSA.

Dr. Tipton testified that due to Jackson's presenting condition, normal urinalysis, a course of antibiotics, and persistent climbing PSA levels, the standard of care required a biopsy of the prostate when he was seen by VA urologist Dr. Madduri in October of 2014.   Dr. Madduri's failure to complete a work-up or biopsy in October of 2014 violated the standard of care.   There is no indication in the record that Jackson failed to follow-up or attend any scheduled appointments.

Dr. Tipton was Jackson's primary physician at the VA beginning on November 18, 2014. Dr. Tipton stated that he did not review Jackson's past medical records, which was required under the standard of care.   He testified that, had he reviewed the records and discovered the elevated PSA, he would have referred Jackson to urology.   Dr. Tipton saw Jackson again in March of 2015 and again did not review the past medical records or refer Jackson for further testing of his prostate.

On June 15, 2015, Dr. Tipton saw Jackson and noted the history of the elevated PSA with no prostate cancer work-up.   Dr. Tipton made a referral request as required by the standard of care, but the referral was discontinued because another urinalysis and trial of antibiotics had to be repeated prior to the urology consultation.   According to VA policy, a urinalysis and trial of antibiotics before a urology consult was necessary based on Jackson's history.   Dr. Tipton testified that the standard of care required that Jackson be seen by a urologist, and that did not occur in the June 2015 timeframe.

The records do not include any letter to Jackson or contact with Jackson informing him of a need to be seen by urology despite that being the standard practice and requirement under the standard of care. Dr. Tipton received alerts from the VA system if a consultation had gone through or had been canceled, and it was his responsibility under the standard of care to re-request a consultation if it was canceled. In December of 2015, Jackson's PSA had risen to 10.52. Dr. Tipton testified that a biopsy had not been completed at this time, despite the standard of care requiring that Jackson be worked up to rule in or out prostate cancer since July of 2014.

Dr. Tipton testified that the delay of twenty months—from July 2014 to March 2016—until Jackson was seen by a non-VA urologist for work-up of his prostate, represents a breach of the standard of care. The delay in diagnosing the prostate cancer also caused a delay in any treatment that Jackson should have received. Dr. Tipton testified that he would defer to Jackson's treating urologists regarding Jackson's prostate cancer care, life expectancy, and whether the delay in diagnosis and treatment allowed Jackson's cancer to progress.

Dr. Bullock is a urologist and urological surgeon who is board certified and in practice at Washington University in St. Louis, Missouri. Dr. Bullock is Jackson's treating physician and served as his expert witness regarding liability, causation, and damages. Dr. Bullock's deposition was taken on April 22, 2019.

Dr. Bullock echoed much of Dr. Tipton's testimony as to the standard of care required for responding to PSA test results. Dr. Bullock's opinions were offered to a reasonable degree of medical certainty. He testified that had Jackson's PSA been checked in 2012, it would have been above 4. When Jackson's PSA was rechecked on July 17, 2014 after he had undergone a round of antibiotics, it was 8.75, ruling out infection. Dr. Bullock testified that the standard of care required that prostate cancer be ruled in or out at that time, and that more likely than not,

Jackson was positive for cancer as of July 2014. He testified that the VA physician was negligent when no biopsy was done after the recheck PSA on July 17, 2014, and no other further work-up for prostate cancer was completed. He found that the standard of care was again breached in August of 2014, when Jackson's PSA was 8.02 and no further work-up was done.

Dr. Bullock testified that the standard of care was not met on Jackson's October 2014 visit with Dr. Madduri, because no biopsy was performed and a referral to another urologist was not carried out. He testified that, more likely than not, Jackson's cancer would have been encapsulated in the prostate in October 2014 and likely before that time.

Dr. Bullock opined that Dr. Tipton was negligent in failing to review Jackson's past medical history and allowing his elevated PSA to go unchecked, untreated, and undiagnosed when he started treating him in November of 2014. The breach of the standard of care by VA physicians continued when Dr. Tipton saw Jackson in March of 2015 and did not recommend or order any treatment related to the high PSA. Dr. Bullock testified that had Jackson's prostate been biopsied and the cancer diagnosed by May of 2015, it would have been encapsulated in the prostate and would have changed the treatment needed for the cancer. Dr. Bullock added that Dr. Tipton further violated the standard of care in June of 2015, when he noted the elevated PSA but did not complete the referral for a urology consult. A biopsy was finally completed in March 2016 and reflected that Jackson had advanced prostate cancer. Jackson was diagnosed with prostate cancer on April 28, 2016.

Dr. Bullock opined that the VA's 20-month delay from July of 2014 until the biopsy on March 7, 2016 that resulted in Jackson being diagnosed with prostate cancer, represents a breach in the standard of care. Furthermore, Dr. Bullock testified that Jackson may have a shortened life expectancy as a result of the negligence of the VA in diagnosing and treating him, because there is a 36% chance the cancer will recur. If Jackson had been treated in a timely manner

before approximately May of 2015, he more likely than not would be cancer free with a full life expectancy.

Dr. Bullock was not able to remove all of the cancerous tissue during the radical prostatectomy he performed on Jackson in August of 2016, which left positive cancer findings in the apical margins of Jackson's prostate. Following his prostate removal surgery, Jackson had a rise in his PSA requiring salvage radiation therapy. Dr. Bullock testified that, had the prostate cancer been diagnosed earlier and contained in the prostate capsule, Jackson would not have required salvage radiation to his prostatic fossa and pelvis, which is the cause of a myriad of his problems.

As a result of the radiation therapy, Jackson has urge incontinence and large volume leakage requiring three to four diapers a day. Jackson also suffers from erectile dysfunction, with unusable erections. Dr. Bullock testified that, had the cancer been timely diagnosed and treated without the need for radiation therapy, Jackson would have responded to medication and would have usable erections. Jackson has received penile injections and medications for his erectile dysfunction (ED), with limited success. Dr. Bullock explained that ED is not just a problem for men, it is a "couple's problem." He noted that Jackson is in a "great marriage," Mrs. Jackson is "very supportive," and Jackson is "young," which led Dr. Bullock to believe Jackson will eventually get an implant. If Jackson lives to a normal life expectancy, he will likely require as many as three penile implant surgeries.

Dr. Bullock further explained that Jackson has blood in his urine due to radiation cystitis that is being treated with hyperbaric chamber therapy. This is a chronic and permanent condition resulting from the radiation therapy. Jackson may have reoccurrences of bleeding at any time throughout his life that will require future treatment and procedures. Jackson also suffers from small-capacity bladder as a result of the radiation therapy, making him urinate and

have a constant sense of urgency.   Jackson is treating with Dr. Henry Lai for this condition and there are several surgeries and procedures available that Jackson may require.

As a result of the delay and the necessity of radiation therapy, Jackson also required hormone therapy.   Hormone therapy has been shown to improve the results of the radiation therapy, however, results in a temporary medical castration of the patient by bringing the testosterone level down during the time period it is given.   If Jackson's PSA should rise in the future, he will have to undergo radiation therapy and hormone therapy again.   The reduction of testosterone resulting from hormone therapy has caused Jackson to experience fatigue.   There is a 36% chance his PSA will rise again, necessitating work-up and treatment for a future cancer.

Due to the delay in diagnosis and the growth into the margins, Dr. Bullock had to cut lower down on the prostate near the apex during the radical prostatectomy, resulting in damage to the urinary sphincter and its surrounding nerves.   This damaged the urinary sphincter, causing incontinence.   Jackson currently has a high-pressure bladder, which does not allow for an artificial urinary sphincter.   When management of his overactive bladder is achieved, Jackson will be a candidate for a surgical placement of an artificial urinary sphincter.

Dr. Bullock opined that the VA failed to properly monitor, diagnose, and treat Jackson. These breaches of the standard of care and the delay they caused led to the growth and progression of Jackson's current prostate cancer diagnosis.   A biopsy in July 2014 would have been positive for cancer and had the prostate cancer been biopsied at any point through May 2015, the cancer would have been encapsulated in the prostate and Jackson's prostate margins would have been negative.   If a timely diagnosis and treatment had occurred, Jackson would not have needed radiation therapy or hormone therapy.   Jackson would have been sexually active with the use of oral medication.   He would not have a need for multiple penile implants.   He

would not experience urge incontinence. He would be prostate cancer free instead of having an ongoing concern of a rise in his PSA requiring further treatment and returning cancer.

If Jackson's prostate cancer recurs, he would first go on hormone ablation therapy for eight to ten years, followed by various chemotherapy regimens for another five or six years. Since there is a one in three chance the prostate cancer shortened Jackson's life, Dr. Bullock could not offer an opinion that it is more likely than not that Jackson's life span *will be* shorter. As such, the life expectancy table reflects that Jackson is likely to live another 21 years. *See* Plaintiff's Exhibit 12.

Dr. Bullock concluded that, had the VA treaters not breached the standard of care and had Jackson been timely diagnosed and treated by at least May of 2015, more likely than not, Jackson would not have required radiation therapy, or hormone therapy; and would be sexually active with the aid of oral medication rather than needing to undergo three penile implants over the next twenty years; and there would not be a 36% likelihood that the prostate cancer will recur.

### B. Damages Evidence

As a result of his condition, Jackson was rated as unemployable by the United States of America in June 2018 and his employment ended on June 29, 2018. At the time of his injuries, Jackson was employed as a Treatment Family Home Coordinator for the Community Counseling Center in Cape Girardeau, Missouri. His full-time salary was $32,000 in 2017. Jackson testified that he enjoyed his work and would have liked to continue working beyond the retirement age of 65.5.

Jackson hired Rebecca M. Summary, Ph.D, a forensic consultant to prepare a report detailing the present value of lost income and lost household services. Defendant has endorsed no expert economist to rebut or dispute the findings of Dr. Summary and has stipulated to the

findings in that report.   The present value of Jackson's economic losses if he were to retire at age 70 is $756,598, and the present value if he were to retire at age 65 is $614,568.

When Jackson was first diagnosed with prostate cancer, his hours were reduced due to his medical condition and treatment.   Eventually he was no longer able to work at all due to fatigue and frequent urination.

The quality of Jackson's life has been significantly impacted by the late diagnosis and treatment of his prostate cancer.   His frequent urination and inability to be sexually intimate with his wife has caused him to feel that he is less of a man.   He is unable to engage in the satisfying work he did at the Community Counseling Center.   He is no longer active in his church.   He is limited in his activities because he needs to be near a bathroom.   His marriage is also suffering because he has become withdrawn from his wife.   Additionally, Jackson's mental health has been negatively impacted which requires him to participate in counseling to help him deal with those issues.   Jackson was previously a physically active and energetic man in his early fifties and now he feels like an old man due to the embarrassment caused by his incontinence related issues and ED.

Jackson never had any issues with incontinence or ED prior to the prostatectomy. Although he experienced issues with incontinence requiring the use of pads following his prostatectomy, the incontinence improved after several weeks.   Jackson also experienced ED after the prostatectomy, but after a while he was able to have sex with his wife.   He believed he was on the road to recovery with regard to both the incontinence and ED.

Jackson's "faith was completely crushed" when he subsequently learned from Dr. Bullock that his PSA had risen, and his cancer was outside the margin of the prostate.   Jackson had to undergo hormone deprivation therapy as a result.   He explained that this treatment involved receiving shots administered by a doctor and caused him to experience hot flashes,

irritability, and difficulty sleeping. The treatment negatively affected his relationship with his wife. He kept to himself and sometimes slept alone during this time period.

Jackson also underwent radiation therapy as a result of the cancer spreading outside his prostate. He received this treatment in a room with concrete walls at the bottom of Barnes Jewish Hospital. A laser pinpointed the cancerous area during the treatment and no one else could be in the room during treatment. He received the radiation treatment every day for over two months, during which time he had to stay at a hotel in St. Louis. During and after the radiation treatments, he was more tired than he had been in the past. His incontinence also became worse after he started radiation therapy. Jackson had to go from using a pad to using adult diapers due to excessive leaking.

At the time of trial, Jackson was experiencing episodes where he completely lost control of his urination. He stated that he has saturated his diapers while in public, which is embarrassing to him. He wears four to five diapers a day. In fact, he was wearing a diaper at the time of his testimony. He urinated in the diaper during court. Jackson wets the bed approximately every other night. He has had to leave public places, such as a baseball game, because his urine soaked through his shorts.

Jackson is aware that he will need to have a surgical procedure that may potentially help with the incontinence. The procedure—a sphincter insert—involves placing a button in his scrotum whereby he can manually control his urine. His doctor told him this is a painful, "excruciating surgery," but it is necessary with his condition.

Jackson testified that, prior to his prostatectomy, he and his wife had sexual intercourse multiple times per week. After the prostatectomy but prior to the radiation, he was able to achieve an erection with the use of medication and engage in sexual intercourse. After the radiation, he was no longer able to achieve an erection at all, even with medication. As a result,

he feels like he is no longer able to provide for his young marriage what is a vital part of intimacy.   Jackson also has difficulty showing any type of affection toward his wife.   He sees a therapist for these issues and worries about losing his wife as a result of them along with his inability to provide for her.

Regarding his ED, Jackson is also aware that there is a procedure to address that issue. He stated that the procedure—a penile implant—involves placing a button in his scrotum.   Once implanted, he would push the button to create an erection that would allow him to engage in sexual intercourse.   Jackson is fearful of the surgery, however, will do it for his wife.   He was told by his doctors that he would have to undergo this procedure three times in his lifetime.

Jackson further worries every day about his reduced survival rate caused by the spread of the cancer into the margin.   He stated that he is always on edge knowing that he could have to go through treatment again if the cancer returns.   Jackson further worries about the impact a recurrence on the cancer would have on his wife.

Jackson also has blood in his urine on a regular basis.   The blood leaks out and comes out in clots when he urinates.   He was receiving daily treatment for this condition at the time of trial.   He and his wife recently purchased a residence in St. Louis so he can be there for his medical treatment.   Jackson's bladder damage problems are permanent.

In addition to depression, Jackson experiences frequent night terrors since he underwent the radiation and hormone therapy.   The night terrors interfere with his sleep and negatively impact his wife's sleep.

Prior to his current medical problems, the Jacksons exercised together regularly.   This is no longer the case due to Jackson's fatigue and concerns of having an accident from incontinence.   Similarly, they no longer entertain in their home because Jackson no longer wants

anyone at his home.   Their vacation travel has also been limited as a result of Jackson's condition and his frequent doctor's appointments.

The experience has caused Jackson to be "extremely angry" because he realizes "this could have been something that was handled years ago" if somebody would have told him.   He explained that he did not know what a PSA was and described himself as a "soldier" following instructions.   He trusted the VA, but his experience has changed his whole perspective.   Given a choice, Jackson would obtain his medical care outside the VA.

After Jackson's PSA rose and he needed hormone deprivation therapy, Mrs. Jackson quit her job and attended treatment with him.   She cared for Jackson by bathing him, helping him dress, preparing his meals, and helping him with medications because he had no energy.   The hormone deprivation therapy lasted two months.   Mrs. Jackson described it as a "very dark time."   She explained that Jackson was short with her; he also experienced mood swings and had severe hot flashes.

Mrs. Jackson also attended Jackson's radiation treatments.   Those treatments caused him to experience hot flashes and he became even more depressed and withdrawn.   Jackson's incontinence worsened after the radiation treatment to the extent he had to start wearing adult diapers, started wetting the bed, and experienced "accidents" when his diapers leaked in public. She stated that these issues persisted at the time of the trial.   Mrs. Jackson is aware that these incidents cause Jackson frustration and embarrassment.   *She also* experiences embarrassment and is frequently forced to leave events early.

As to marital intimacy, Mrs. Jackson testified that they have not been able to have sexual intercourse since the radiation.   It has affected their marriage tremendously, in that Jackson is withdrawn, depressed, no longer shows her affection, and feels like less of a man.   She is frustrated because this has been occurring for years and she wonders if it will ever end.   Mrs.

Jackson is hesitant for Jackson to undergo the penile implant surgeries, because he has already been through so much. She stated that she would rather suffer herself than have him undergo the procedure.

Mrs. Jackson is also terrified by the prospect that Jackson's cancer may come back. She worries about his decreased chance of survival every day.

Additional issues that cause Mrs. Jackson concern include the fact Jackson: has blood in his urine which causes him to be depressed and embarrassed; experiences night terrors, during which he wakes up screaming and shaking; receives weekly treatment for his depression; and does not want to do anything or go anywhere. She is concerned about her relationship with Jackson because of all the issues they have experienced. She questions whether Jackson will return to being himself. Even with all the worry and hardships, she is devoted to her husband and plans to honor her vows.

## II. Conclusions of Law

This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b). The FTCA provides that "[t]he United States shall be liable ... to tort claims, in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. Thus, liability under the FTCA attaches only where state law would impose liability on a private individual in similar circumstances. *First Nat'l Bank in Brookings v. United States*, 829 F.2d 697, 700 (8th Cir. 1987). To this end, the law of the state in which the negligence arises "provides the source of substantive liability under the FTCA." *Sorace v. United States*, 788 F.3d 758, 763 (8th Cir. 2015). In this case, Plaintiffs' claims arise from the treatment Jackson received at VA facilities in Missouri. Thus, Missouri law applies to Plaintiffs' medical malpractice claims.

Under Missouri law, a health care provider commits the tort of medical malpractice when the provider has (1) "failed to use that degree of skill and learning ordinarily used under the same

or similar circumstances by members of the defendant's profession", i.e. breached the standard of care, and (2) "that such failure directly caused or contributed to cause the plaintiff's injury." Mo. Rev. Stat. § 538.210.

The specific duty required of the defendant is defined by the profession, and an "expert witness is generally necessary to tell [the fact finder] what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession." *Ostrander v. O'Banion,* 152 S.W.3d 333, 338 (Mo. Ct. App. 2005). Once the duty is established by expert testimony, whether a physician was negligent under the evidence presented becomes a question of fact for the fact finder. *Lashmet v. McQueary,* 954 S.W.2d 546, 551 (Mo. Ct. App. 1997).

In order to prevail in this case, Plaintiffs must prove through expert testimony that VA physicians breached the standard of care, and that the breach caused Jackson's injuries.

As to Mrs. Jackson's loss of consortium claim, Missouri law recognizes that,

> [w]hen a married person is injured, two causes of action arise: one accrues to the injured person for the injuries suffered directly by him or her, and the other accrues to the injured person's spouse for damages suffered as a result of the loss of the injured person's services, society, companionship, and sexual relations (loss of consortium).

*Kingman v. Dillard's Inc.*, 643 F.3d 607, 615 (8th Cir. 2011) (quoting *Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76, 112-13 (Mo. Ct. App. 2006)). Loss of consortium also encompasses new services that the consortium spouse must take on for the injured spouse. *See, e.g Helming v. Dulle,* 441 S.W.2d 350, 354-55 (Mo. 1969) (husband's injuries required wife to take on "varied and sundry duties" not previously performed).

## A.       Liability and Causation

To support the elements of their medical malpractice claim, Plaintiffs presented substantial evidence through the credible testimony of Dr. Bullock and the admissions of Dr. Tipton.

Although the Defendant does not formally concede liability, it did not offer any expert witness testimony regarding standard of care or causation.   Thus, the Court finds that the Defendant breached the standard of care when VA physicians failed to rule out prostate cancer by means of a biopsy once Jackson's PSA had risen above 4 to 8.75 on July 16, 2014. Defendant continued to breach the standard of care at each of Jackson's subsequent visits to the VA on August 18 and October 20, 2014; and March 3, June 2, June 15, and December 4, 2015.

With respect to causation, Dr. Bullock testified that, had Jackson undergone a prostate biopsy in July 2014, such a biopsy would more likely than not have shown cancer.   He further testified that by May 2015, Jackson's cancer was no longer encapsulated within the prostate and that it had instead spread locally to the surrounding tissue.   Dr. Bullock testified that had Jackson's prostate been biopsied and cancer been diagnosed by May 2015, it would have been encapsulated and more likely than not would have required only a prostatectomy.   Due to the VA's failure to diagnose the cancer from May 2015 through April 2016, additional treatment beyond the prostatectomy—salvage radiation to the prostatic fossa and pelvis and hormone ablation therapy—were necessary.   As a result of the salvage radiation, Dr. Bullock testified that Jackson suffers from incontinence, complete ED, and a reduced life expectancy.   The hormone ablation therapy resulted in fatigue and other residual effects.   There is a 36% chance that Jackson's PSA will rise again, necessitating additional work-up and treatment for cancer.   Thus, the Court further finds that the Defendant's breach of the standard of care caused Jackson to undergo salvage radiation therapy and hormone ablation therapy, which caused him to

experience incontinence, complete erectile dysfunction, a reduced life expectancy, and other residual effects.

**B.      Damages**

Under the FTCA, damages are determined according to the relevant state law.   *Wilkinson v. United States*, 564 F.3d 927, 934 (8th Cir. 2009); s*ee also Limone v. United States*, 579 F.3d 79, 103 (1st Cir. 2009) ("We approach the awards at issue here mindful that, in an FTCA case, both the nature of allowable damages and the measure of those damages are drawn from state law").

Section 538.215.1 of the Missouri Revised Statutes requires the trier of fact in a medical malpractice action to itemize the damages found according to five categories:   past economic damages; past noneconomic damages; future medical damages; future economic damages; and future noneconomic damages.

Jackson did not submit any evidence of the value of medical expenses incurred in the past or to be incurred in the future.   As a result, he is not entitled to an award of medical expenses.

**1.      Economic Damages**[2]

The parties do not dispute Jackson's economic damages.   As a result of the injuries Jackson sustained due to the Defendant's failure to diagnose and treat his prostate cancer, Jackson is unemployable.   He was rated as unemployable by the United States of America in June 2018 and his employment ended on June 29, 2018.   His full-time salary was $32,000 in 2017.   Dr. Summary calculated the present value of Jackson's economic losses if he were to retire at age 70 as $762,652.

The Court finds that the evidence presented shows that Jackson enjoyed his work and

---

[2]  Under Mo. Rev. Stat. § 538.205(2), "economic damages" are defined as "damages arising from pecuniary harm including, without limitation, medical damages, and those damages arising from lost wages and lost earning capacity."

would have worked until the age of 70.   Thus, Plaintiff Coyvell Jackson is entitled to a total of $762,652 in past and future economic damages.   Dividing this sum into past and future amounts, as required by Mo. Rev. Stat. § 538.215.1, the Court will award Jackson:   $68,780.17 in past economic damages, representing lost wages from the period of April 2018 to date; and $693,871.83 in future economic damages, for lost wages from the present to age 70.

Plaintiff Brenda Jackson has no claim for economic damages.

### 2. Noneconomic Damages[3]

The parties dispute whether Missouri's statutory caps on noneconomic damages, enacted in 2015, apply to the instant action.   By way of background, Missouri first enacted medical malpractice damages caps in 1986 as a response to the insurance "crisis."   *Klotz v. St. Anthony's Medical* Center, 311 S.W.3d 752, 772 (Mo. 2010); *see* S.B. 663, 83d Gen. Assemb., 2d Reg. Sess. (Mo. 1986).   Chapter 538 of Missouri's Revised Code, titled "Tort Actions Based on Improper Health Care," codified this medical malpractice law.   In 2012, the Missouri Supreme Court invalidated the caps imposed by Chapter 538 on the basis the caps violated the common law right to have damages assessed by a jury.   *See Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 641 (Mo. 2012).   In response, the Missouri legislature passed a new tort reform law, effective August 28, 2015, which removed medical malpractice claims from the common law and replaced such claims with a statutory cause of action.   *See* Mo. Rev. Stat. § 538.210. Consequently, prior to August 28, 2015, no damage caps applied to the assessment of noneconomic damages in medical malpractice cases in the state of Missouri.

---

[3] "Noneconomic damages," include: "damages arising from nonpecuniary harm including, without limitation, pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium but shall not include punitive damages."   *See* Mo. Rev. Stat. § 538.205(9).

The 2015 law caps noneconomic damages at $700,000 in cases involving a catastrophic[4] injury. *Id.* at § 538.210.2(2). It further provides that "any spouse claiming damages for loss of consortium of their spouse shall be considered to be the same plaintiff as their spouse." *Id.* at § 538.210.7. The legislation requires these caps to increase 1.7 percent per year. The cap currently stands at $748,828, when adjusted for inflation. (Doc. 50 at p. 8 fn 1.)

As a result, if the Court finds the caps apply, Plaintiffs would be limited to a maximum recovery of $748,828 for their combined noneconomic damages.

### i.    Applicability of Caps

The Defendant argues that federal law determines when and how Plaintiffs' claims accrued for the purpose of applying Missouri's damages caps. Defendant contends that the Jacksons' claims accrued on or about April 28, 2016, when Jackson was diagnosed with cancer. Defendant further argues that application of Missouri's damages caps has no impermissible retroactive effect even if Plaintiffs' claims accrued before the enactment of the caps.

Plaintiffs contend that Defendant is conflating the issue of when a plaintiff has a right to pursue a cause of action—a matter of state substantive law—with the issue of when a statute of limitations begins to run—a matter of federal procedural law. Plaintiffs argue that, because the negligence in this case occurred by July 2014, application of the caps would have a retroactive effect precluded by Missouri law.

As an initial matter, it is undisputed that state law damages caps apply generally in FTCA cases. *See Richards v. United States,* 369 U.S. 1, 3, 11-16 (1962) (holding that the forum state's whole law applies, including its choice of law rules and statutory damages caps); *see also Knowles v. United* States, 91 F.3d 1147, 1150 (8th Cir. 1996) (applying South Dakota statutory

---

[4]Defendant does not dispute that the instant case involves a catastrophic injury. Noncatastrophic injuries are capped at $400,000. *See* Mo. Rev. Stat. § 538.210.2(1).

damages caps to FTCA action).   The issue in this case is whether application of Missouri's caps to the Jacksons would have an impermissible retroactive effect.   In resolving this issue, the Court must determine whether federal or state law governs the analysis and when a claim accrues for the purpose of applying the caps.

### *Applicable Law*

Although state substantive law establishes and defines a claim under the FTCA, federal law defines the limitations period and determines when the claim accrues.   *See Reilly v. United States*, 513 F.2d 147 (8th Cir. 1975); *see also Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) (citing *Washington v. United States*, 769 F.2d 1436, 1437-38 (9th Cir. 1985)).   The FTCA has a two-year limitations period, which, in medical malpractice actions, accrues when "the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice upon which the cause of action is based."   *Reilly*, 513 F.2d at 148; *see Bagley v. United States*, 215 F. Supp. 3d 831, 835-37 (D. Neb. 2016) (FTCA's two-year statute of limitations for medical malpractice actions preempts a state's statute of limitations, which is procedural, but not a state statute of repose that is substantive).

Applying this law to the instant case, Plaintiffs' claim accrued for the purpose of the FTCA statute of limitations when Plaintiffs discovered Jackson's injury on April 28, 2016. Plaintiffs, therefore, had two years from the date Jackson was diagnosed with cancer to file a claim.   Plaintiffs do not dispute this, and there is no question that the Jacksons timely filed the instant action.   Plaintiffs instead argue that the concept of "accrual" for the purpose of the running of the statute of limitations is a separate and distinct concept from "accrual" for the purpose of applying Missouri's medical malpractice damage caps, which may result in two different accrual dates.   The undersigned agrees.

*Accrual*

The Court notes at the outset that neither the United States Court of Appeals for the Eighth Circuit nor a district court in this circuit has addressed this issue. The Eighth Circuit has, however, noted that "[i]t is true that in certain contexts, the words "accrue" and "arise" have significantly different meanings." *Van Den Hul v. Baltic Farmers Elevator Co.*, 716 F.2d 504, 510 n. 4 (8th Cir. 1983). The Fifth Circuit provided a detailed discussion of this distinction in the context of a FTCA claim in *Quinton v. United States*, 304 F.2d 234, 235 (5th Cir. 1962). The issue before the Court was whether state or federal law determines when a "claim accrues" for the purpose of the statute of limitations in a medical malpractice action. *Id.* The Court concluded that federal law determines the date upon which the statute of limitations begins to run. In so finding, the Court distinguished this date from the date a plaintiff *first has the right to file a claim,* which is governed by state law. Citing a footnote from its earlier decision in *United States v. Reid*, 251 F.2d 691, 694 fn 4 (5th Cir. 1958), the Court summarized that "it is the *state* law which determines *when* if ever, a claim comes into being. But once it does the time in which the F.T.C.A. suit must be filed is controlled by the Federal Act." *Id.* at 239 (Emphasis in original) (Citations omitted). "In other words, we look to state law to determine whether the plaintiff's action is premature, but to federal law to determine whether the action is stale." *Id.* at 239-40.

In another out of circuit case, *In re E.I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, the Southern District of Ohio considered whether to apply Ohio Tort Reform Act caps on noneconomic damages to the plaintiff's state personal injury claims. 2015 WL 10936122 (S.D. Ohio, Sept. 8, 2015). DuPont argued that the Plaintiff's claims accrued after the statute's effective date, when she discovered her injury was related to her exposure to DuPont's chemicals. *Id.* at * 3. The court disagreed, declining to "impose a discovery rule into the

determination of whether the Ohio Tort Reform Act applies to a cause of action." *Id.* at *5. With regard to the triggering date for application of the statute, the Court noted that "many courts have appropriately considered it a distinct concept from the date triggering a statute of limitations, particularly one that incorporates a discovery rule." *Id.* (collecting cases). The Court concluded that the discovery rule did "not apply to the determination of when a claim arose for purposes of determining whether the Tort Reform Act applies to a cause of action." *Id.* Instead, the Court proceeded to determine "when Ms. Bartlett's *injury arose*—not when she discovered it was connected to her ingestion of C-8." *Id.* (Emphasis added.)

The Court finds these decisions instructive in recognizing that different accrual dates may be determined for different purposes. Defendant in the instant case, like DuPont, is asking the Court to impose a statute of limitations discovery rule into the issue of whether Missouri's damages caps apply to Plaintiffs' claims. In the absence of controlling authority compelling that analysis, the Court declines to adopt that approach. The purpose of a statute of limitations discovery rule is to extend the time period for a plaintiff to file a claim in circumstances where it is not reasonable for the plaintiff to discover their injury in conjunction with the injury. It therefore seeks to determine the latest date on which a plaintiff may file a claim. This analysis does not address the corollary of when a claim first came into existence such that the filing of a claim would not have been premature. The Court will look to Missouri substantive law to determine this date for the purpose of applying the damages caps.

The applicable Missouri statute provides:

All actions against physicians, hospitals,…and any other entity providing healthcare services and all employees of any of the foregoing acting in the course of their employment, for damages for malpractice, negligence, error or mistake related to health care shall be brought within two years from the date of occurrence of the act of neglect complained of…

Mo. Rev. Stat. § 516.105(2).

The undisputed evidence reveals that the malpractice began, at the latest, in July 2014 when the VA breached the standard of care by failing to evaluate Jackson for prostate cancer. This breach continued and, by May 2015, Jackson's cancer was no longer encapsulated within the prostate and had spread locally to the surrounding tissue. In other words, Jackson had sustained his injury—the spread of the cancer leading to the additional procedures and damages—by May 2015. The Defendant's continuous breach of the standard of care "directly caused or contributed to cause the plaintiff's injury." Mo. Rev. Stat. § 538.210. As such, had the Jacksons been aware of the malpractice, they could have filed their case at that time. The Jacksons' claims, therefore, accrued in May 2015 which predates the enactment of Missouri's noneconomic damages caps.

### *Retroactivity Analysis*

The Court next considers the issue of retroactivity. The Supreme Court has stated that a "presumption against retroactive legislation is deeply rooted in our jurisprudence…" *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). Although "prospectivity remains the appropriate default rule," *id*. at 272, "deciding when a statute operates 'retroactively' is not always a simple or mechanical task, *id*. at 268. The same is true under Missouri law. The Missouri Constitution prohibits laws that are retrospective in operation. Mo. Const. art. I, sec. 13. ("That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation,…can be enacted.") The prohibition reflects "the underlying repugnance to the retrospective application of laws." *State ex rel. St. Louis-San Francisco Ry. Co. v. Buder*, 515 S.W.2d 409, 411 (Mo. banc 1974). This provision has been "part of Missouri law since th[e] State adopted its first Constitution in 1820." *Doe v. Phillips*, 194 S.W.3d 833, 850 (Mo. banc 2006).

Defendant, relying upon *TwoRivers v. Lewis*, 174 F.3d 987 (9th Cir. 1999), argues that federal law governs this analysis. In *TwoRivers*, the Ninth Circuit considered whether to apply a current or prior version of the Arizona statute of limitations in a claim brought pursuant to 42 U.S.C. § 1983. The Court reversed the decision of the district court retroactively applying the amended statute of limitation. *TwoRivers*, 174 F.3d at 992. The Court also addressed the issue of whether a "federal court borrowing a state statute of limitations also borrows the state retroactivity law." *Id.* It found that, "where a court applies a state statute of limitations in construing a federal substantive claim, federal common law should fill the gaps in applying federal statutory law, except in very limited circumstances." *Id.* at 993. This holding pertains solely to federal courts *borrowing state statute of limitations* and is therefore not relevant in the instant action.

Defendant next applies the retroactivity framework set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). In *Landgraf,* the United States Supreme Court considered whether an amendment to Title VII's ban on employment discrimination authorizing compensatory and punitive damages applied to pre-enactment conduct. The Court held it did not. The Court set forth a two-part test to determine whether federal statutes have an impermissible retroactive effect. First, a court should determine "whether Congress has expressly prescribed the statute's proper reach." 511 U.S. at 280. If Congress has done so, "there is no need to resort to judicial default rules. *Id.* Second, if the statute contains no "express command," the court moves on to determine whether applying the statute would have a retroactive effect. *Id.* The Court noted that a statute does not operate retrospectively "merely because it is applied in a case arising from conduct antedating the statute's enactment." *Id.* at 269 (internal citation omitted). Rather, the Court must ask "whether the new provision attaches new legal consequences to events completed before its enactment," must consider the "nature

and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event," and should apply "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* at 270. Defendant cites Eighth Circuit precedent holding there is "generally no retroactivity concern when a new *procedural rule* goes into effect after a cause of action accrues, but before filing of a lawsuit based on pre-enactment conduct." *Prof. Mgmt. Assocs., Inc. Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800, 803 (8th Cir. 2003) (emphasis added); *see also Popp Telecom, Inc. v Am. Sharecom, Inc.*, 361 F.3d 482, 488 (8th Cir. 2004). Defendant argues that applying these principles to the instant case results in a finding that Missouri's damages caps have no retroactive effect.

Defendant's analysis is flawed in two respects. First, Defendant's argument is premised on the assumption that Missouri's damages caps are procedural in nature. "When determining the scope of Missouri law, [the Court is] bound by the decisions of the Supreme Court of Missouri." *Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011). The Court looks to how Missouri characterizes its own law in determining whether the law is substantive or procedural. *See Bagley*, 215 F. Supp.2d at 835-36 (examining Louisiana law to determine whether time limitation was substantive or procedural). Missouri courts construe statutory damage caps as substantive. *See Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752 (Mo. banc 2010). The Seventh Circuit has described this characterization as "sensible, because a cap on damages reflects a judgment about the severity of the sanction appropriate to regulate the activity of potential injurers." *Carter v. United States*, 333 F.3d 791, 794 (7th Cir. 2003).

Second, the Missouri Supreme Court has already addressed the retroactivity of caps on actual damages in *Klotz*. In *Klotz*, the Court considered the 2005 amendments to § 538.210, which established a noneconomic damages cap of $350,000 and applied "to all causes of action filed after August 28, 2005." 311 S.W.3d at 758. Klotz suffered injuries in 2004, and filed suit

the same year. He subsequently amended his petition to include his wife, voluntarily dismissed his action without prejudice in December 2005, and refiled the action in 2006. The case was tried to a jury in July 2008. The Court stated that "[i]t is settled law in Missouri that the legislature cannot change the substantive law for a category of damages after a cause of action has accrued." *Id.* at 760. Applying this rule, the Court held that an amended statute that placed a cap on non-economic damages in a medical malpractice case could not be retroactively applied to a cause of action that accrued prior to the amended statute's effective date because the amended statute would be unconstitutional as applied. *Id.* Thus, under *Klotz*, a cap on actual damages is substantive and cannot be retroactively applied to actions that accrued before its effective date. *See also Dixson v. Missouri Dep't of Corrections*, 2019WL3294205, *4 (Mo. Ct. App. July 23, 2019) (finding application of statutory amendment to caps on damages under Missouri Human Rights Act would be unconstitutional, "under *Klotz*, a cap on actual damages is substantive and cannot be applied to actions that accrued before its effective date").

In sum, because Missouri's damages caps are substantive and the Missouri Supreme Court has found that they cannot be retroactively applied to actions accruing before their effective date, the retroactivity analysis set forth in *Landgraf* is inapplicable. As Plaintiffs point out, this result is illustrated by a case relied upon by the Defendant. Defendant notes (Doc. 50 at p. 23) that, in *Wilson v. United States*, the Eastern District of Virginia held that the application of West Virginia damages caps enacted after the accrual of the plaintiff's medical malpractice claim brought under the FTCA did not "give rise to a claim of unconstitutional retroactivity." 375 F. Supp.2d 467, 472 (E.D. Va. 2005). In making this determination, the Court noted that the FTCA "allows the United States to be sued and held liable for personal injuries in tort only 'in the same respect as a private person under the law of the place where the act occurred.'" *Id*. at 470 (citing *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001)). The Court stated that,

given this express statutory language, "the extent of defendant's liability to plaintiff in this instance is necessarily governed by West Virginia law" as the alleged negligent acts occurred in West Virginia. *Id.* (Citing *Dunbar Corp. v. United States*, 905 F.2d 754, 757 (4th Cir. 1990) (wherein the Fourth Circuit recognized that 28 U.S.C. § 1346(b) directs that the "United States' liability under the FTCA depends upon state law.") The district court did not apply *Landgraf,* but instead examined West Virginia law to find no authority that retroactive application of the caps was unconstitutional. *Id.* at 472. Here, unlike West Virginia, Missouri's highest court has found that the Missouri caps cannot be applied retroactively. *See Klotz*, 311 S.W.3d at 760 ("It is settled law in Missouri that the legislature cannot change the substantive law for a category of damages after a cause of action has accrued.")

The Court next considers whether applying Missouri's caps to the Jacksons' claims would involve a retroactive application prohibited by *Klotz*. The *Klotz* Court described the issue as "straightforward" as applied to the Klotzes, as "the malpractice accrued" more than a year before the statute was passed. *Id.* at 760. The *Klotz* analysis supports that a court should look to when the negligent conduct or "malpractice" occurred in determining whether the application of a statute is permissible.

The Court has found that the Jacksons' claim accrued in May 2015, when the negligent action was completed, and Jackson sustained his injury. Because the Jacksons' claim accrued prior to the enactment of the 2015 caps, application of the caps to the Jacksons would constitute an impermissible retroactive application under *Klotz*. *Cf. Cook v. Newman*, 142 S.W.3d 880, 894 (Mo. 2004) (applying 1986 version of noneconomic damages caps when cause of action arose after the enactment of the statute; not retroactive application because the "legislature did not enact a statute during the life of this cause of action").

The only reason the Jacksons did not file suit in May 2015 was because they did not become aware of their claim until Jackson's cancer was finally diagnosed in April 2016. Defendant should not be permitted to benefit from its own negligence. Indeed, in analogous contexts, the Eighth Circuit has recognized that a plaintiff should not be penalized when the government prevented the claimant from obtaining knowledge of an injury. *See Clifford by Clifford v. United States*, 738 F.2d 977, 980 (8th Cir. 1984) (when plaintiff went into a coma due to government malpractice, claim did not accrue for purpose of statute of limitations until someone had knowledge of his injury because "alleged malpractice itself…has prevented the claimant from ever obtaining that knowledge").

Defendant's argument based on the language of the FTCA that it can only be held liable "in the same manner and to the same extent as a private individual under like circumstances" is unavailing. 28 U.S.C. § 2674. The reasoning of the Missouri Supreme Court in *Klotz* establishes that application of the caps under the circumstances of this case would constitute an impermissible retroactive application of the statute. A private defendant would not be able to take advantage of the caps in this case because the malpractice occurred prior to the enactment of the caps. The government likewise cannot take advantage of the caps.

Lastly, Defendant contends that there are no fairness concerns in this case. To illustrate this point, Defendant first acknowledges Plaintiffs' argument that a hypothetical plaintiff who filed a cognizable claim in June 2015 based on events that occurred prior to June 2015 would unquestionably be exempt from the damages caps. Defendant counters that a plaintiff who filed a cognizable claim in June 2016 based on events that occurred in 2016 would unquestionably be limited by the caps, even if that plaintiff were in every way the same as Jackson.

Defendant's hypothetical fails to illustrate the fairness concerns implicated in this case. Here, unlike Defendant's hypothetical claimant, the law in effect at the time the malpractice

occurred provided greater recovery than the law at the time Plaintiffs filed their action. The only reason Plaintiffs did not file sooner and avail themselves of greater potential for recovery was due to Defendant's negligence. The Court further notes that this case is unique in that the Defendant does not challenge Plaintiffs' expert's causation opinion that Plaintiff sustained his injury by May 2015, prior to the implementation of the caps. Although Defendant's hypothetical accurately conveys that two plaintiffs with the same amount of damages would be entitled to different amounts based on whether the injury occurred in 2015 versus 2016, the instant case involves additional factors not present in the hypothetical.

For the reasons discussed above, the Court finds that the 2015 caps on noneconomic damages do not apply to the Plaintiffs' claims.

### ii.     The Jacksons' Noneconomic Damages

The Eighth Circuit has noted that "[t]here is no precise or exact measuring stick for calculating general damages for pain and suffering." *Taken Alive v. Litzau,* 551 F.2d 196, 198 (8th Cir. 1977). "[A]wards for pain and suffering are highly subjective," *Morrissey v. Welsh Co.,* 821 F.2d 1294, 1301 (8th Cir. 1987), and "[d]epending upon the fact situation, the range between an inadequate award for pain and suffering and an excessive award can be enormous." *Id.* "There is no special standard of review for cases involving public funds," and the "government is treated the same as any other tortfeasor." *Gonzalez v. United States*, 681 F.3d 949, 952-53 (8th Cir. 2012). Appellate judges only substitute their "highly subjective" valuation of pain and suffering for the district [court]'s if an award is "so extreme as to fall outside this 'enormous' range of discretion." *Id.*

Plaintiff Coyvell Jackson requests that the Court award him $2,000,000 in past noneconomic damages and $5,237,348 in future noneconomic damages, for a total award of $7,237,348 in noneconomic damages. His wife, Plaintiff Brenda Jackson requests $1,000,000

in past noneconomic damages and $3,000,000 in future noneconomic damages, for a total award of $4,000,000.   Defendant does not address the amount of Plaintiffs' damages other than arguing the statutory caps apply, which would limit the noneconomic damages to $748,828.

As to Jackson's past noneconomic damages, due to the Defendant's negligence, Jackson had to undergo radiation therapy every day for an approximate two-month period in St. Louis. He also had to undergo hormone therapy.   These treatments resulted in significant physical and emotional symptoms.   The treatment prevented Jackson from engaging in employment and hobbies that he enjoyed, causing him significant emotional distress and embarrassment. Additionally, he was unable to engage in sexual intercourse, which caused strain in his relationship with his wife.   In the future, Jackson likely faces additional surgical procedures for his incontinence and bladder issues.   Jackson will either remain unable to engage in sexual intercourse with his wife, or undergo invasive penile implant surgeries to attempt to resolve his ED.   Either way, there is no doubt that Jackson's medical issues and symptoms have caused him significant pain, suffering, mental anguish, loss of capacity to enjoy life, severe physical impairments, and loss of consortium with his wife.   He will also continue to worry about recurrence of his cancer.   Not to mention the fact that his life expectancy has been decreased. In consideration of these factors and the other evidence of record, the Court will award Jackson: $1,000,000 for past noneconomic damages; and $2,300,000 for future noneconomic damages.

Regarding Mrs. Jackson's claim for loss of consortium, Mrs. Jackson quit a job she enjoyed in order to care for Jackson in 2016.   She attended Jackson's radiation and hormone therapy treatments and assisted Jackson with personal care during this period.   Mrs. Jackson's relationship with her husband suffered during this period due to the physical and emotional symptoms Jackson experienced.   She is no longer able to engage in sexual intercourse with her husband and it is unknown when, if ever, this will change.   Jackson no longer has the desire to

engage in activities the couple once enjoyed together, which has in turn negatively impacted Mrs. Jackson's quality of life. Mrs. Jackson worries about the significant chance that Jackson's cancer will return. In recognition of the loss of consortium she has suffered, the Court will award Mrs. Jackson $500,000 for past noneconomic damages; and $1,149,750 in future noneconomic damages.

## Conclusion

For the reasons stated above, the Court awards Plaintiff Coyvell Jackson a total of $4,062,652 in damages on his FTCA claim, which includes:

1)      $68,780.17 for past economic damages;

2)      $1,000,000 for past noneconomic damages;

3)      $693,871.83 for future economic damages; and

4)      $2,300,000 for future noneconomic damages.

The Court awards Plaintiff Brenda Jackson a total of $1,649,750 in damages on her derivative loss of consortium claim, which includes:

1)      $500,000 for past noneconomic damages; and

2)      $1,149,750 in future noneconomic damages.

A separate Judgment accompanies these Findings of Fact and Conclusions of Law.

Dated this 30th day of December, 2019.

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE